UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMAZAN M., <br><br> Petitioner, <br><br> v. <br><br> TONYA ANDREWS, Facility Administrator of Golden State Annex Detention Facility; SERGIO ALBARRAN, Acting Field Office Director of the San Francisco Immigration and Customs Enforcement Office; TODD M. LYONS, Acting Director of United States Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the United States Department of Homeland Security; PAMELA BONDI, Attorney General of the United States, <br><br> Respondents. | No. 1:25-cv-01356-KES-SKO (HC) <br><br> ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION <br><br> Doc. 3 |

Petitioner Ramazan M. is a 25-year-old asylum-seeker from Russia who entered the United States in December 2022 with his wife.[1] He was detained by immigration officials for several days upon entry, but after immigration officials determined that he was neither a danger nor a flight risk, they released him on humanitarian parole. Over the course of the next two-and-a-half years, petitioner built a life in Sacramento with his wife, where he became gainfully

---

[1] As recommended by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, the Court omits petitioner's full name, using only his first name and last initial, to protect sensitive personal information. *See* Memorandum re: Privacy Concern Regarding Social Security and Immigration Opinions, Committee on Court Administration and Case Management, Judicial Conference of the United States (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

1

employed, volunteered at a mosque and a foodbank, and maintained a clean criminal record. In May 2025, after an immigration judge denied his asylum claim, Immigration and Customs Enforcement ("ICE") agents told him to report to their office to pick up documents; when he arrived, they re-detained him.

On October 14, 2025, petitioner filed a petition for writ of habeas corpus, Doc. 1, and a motion for a temporary restraining order, Doc. 3, arguing that his re-detention without a pre-deprivation hearing violates the Due Process Clause of the Fifth Amendment and that ICE failed to follow its regulations governing the termination of his humanitarian parole. He seeks his immediate release from detention and an injunction prohibiting the government from re-detaining him unless it first provides him with a hearing before a neutral adjudicator. *Id.* at 16. Respondents filed an opposition on October 22, 2025, Doc. 7, and petitioner filed a reply on October 24, 2025, Doc. 8.[2] For the reasons explained below, petitioner's motion for temporary restraining order, which the Court converts to a motion for preliminary injunction, is granted.

**I.      Background**[3]

Petitioner and his wife fled Russia in 2022 to seek asylum in the United States. Doc. 1 at ¶ 37. Petitioner entered the United States through a port of entry at the southern border, and he was detained by immigration officials for several days, but immigration officials decided to release petitioner on humanitarian parole so that he could pursue his asylum case. Doc. 1-3, Ramazan M. Decl. at ¶ 3; Doc. 7-1, Jaimes Decl. at ¶ 5. Immigration officials served him with a notice to appear for removal proceedings. Doc. 7-1, Jaimes Decl. at ¶ 6; Doc. 8-2 (notice to appear).

---

[2] In their opposition, respondents request that the Court "strike and [] dismiss all unlawfully named officials under § 2241." Doc. 11 at 1, n.1. Such a "request for court order must be made by motion." *Ortega v. Kaiser*, No. 25-CV-05259-JST, 2025 WL 2243616, at *4 (N.D. Cal. Aug. 6, 2025). "[A] request for affirmative relief is not proper when raised for the first time in an opposition." *Id.* Respondents' request is therefore denied without prejudice.

[3] The facts articulated in this section come from petitioner's verified petition and other evidence in the record. A court "may treat the allegations of a verified . . . petition [for writ of habeas corpus] as an affidavit." *L. v. Lamarque*, 351 F.3d 919, 924 (9th Cir. 2003) (citing *McElyea v. Babbitt*, 833 F.2d 196, 197–98 (9th Cir. 1987)).

1    By regulation, immigration officials may parole a noncitizen pursuant to 8 U.S.C.
2 § 1182(d)(5)(A) "for 'urgent humanitarian reasons' or 'significant public benefit,' provided the
3 [noncitizen] present[s] neither a security risk nor risk of absconding." 8 C.F.R. § 212.5(b)
4 (quoting 8 U.S.C. § 1182(d)(5)(A)). "Release [therefore] reflects a determination by the
5 government that the noncitizen is not a danger to the community or a flight risk." *Saravia v.*
6 *Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v.*
7 *Sessions*, 905 F.3d 1137 (9th Cir. 2018). Immigration officials released petitioner with
8 instructions to take pictures on a cell phone to verify his location and to report to the ICE office in
9 Sacramento, California. Doc. 1 at ¶ 38; Doc. 1-3, Ramazan M. Decl. at ¶ 4. Petitioner followed
10 immigration officials' instructions, and he and his wife resettled in Sacramento. Doc. 1 at ¶ 39;
11 Doc. 1-3, Ramazan M. Decl. at ¶ 5. ICE agents in Sacramento placed petitioner in the Intensive
12 Supervision Appearance Program, through which he was required to wear an ankle monitor,
13 attend regular in-person check-ins, and inform ICE of location and address changes. Doc. 1 at
14 ¶ 39.

15    Over the next two and a half years, petitioner and his wife built a life in Sacramento.
16 Doc. 1 at ¶ 40. Petitioner obtained employment authorization from ICE, worked full-time as an
17 app-based driver to support his family, obtaining a "Diamond Tier status" from the positive
18 reviews he received, and paid taxes. *Id.* Petitioner also became involved in the community,
19 where he volunteered at his mosque and at a foodbank. *Id.* Letters of support from community
20 members, which are appended to his petition, describe his positive character and volunteer work
21 record. Doc. 1-9, Ex. G. He and his wife are expecting a child in November 2025. Doc. 1-3,
22 Ramazan M. Decl. at ¶ 12.

23    During his time on release, petitioner maintained a clean criminal record, and he complied
24 with his release requirements, with three exceptions: (1) he missed a scheduled check-in on
25 October 21, 2023; (2) he showed up for a check-in on October 30, 2023, and was asked to wait
26 but left before completing the check-in; and (3) he was issued a violation for tampering with his
27 ankle monitor strap on May 20, 2024. *See* Doc. 1 at ¶ 40, Doc. 7-1, Jaimes Decl. at ¶¶ 7–9. After
28 these incidents, petitioner appeared in-person for check-ins with immigration officers and for at

1   least one immigration court hearing. *See id.* ¶¶ 10–11(noting petitioner attended immigration
2   court hearing on May 2, 2025 and reported upon request to ICE office on May 6, 2025); Doc. 1-3,
3   Ramazan M. Decl. at ¶¶ 5, 7–8 (noting that he appeared at the ICE office nearly thirty times in
4   total for maintenance on his ankle monitor).

5       Petitioner submitted a timely claim for asylum, withholding of removal, and deferral of
6   removal under the Convention Against Torture. Doc. 1 at ¶ 39.[4] At a hearing on May 2, 2025,
7   the immigration judge denied relief and issued an order of removal but informed petitioner that he
8   had the right to appeal the decision. *Id.* ¶ 42; Doc. 1-3, Ramazan M. Decl. at ¶ 12. The following
9   business day, an ICE agent called petitioner and instructed him to report to the ISAP office that
10  day to pick up court documents. Doc. 1 at ¶ 42; Doc. 1-3, Ramazan M. Decl. at ¶ 16. Petitioner
11  states that he suspected that ICE intended to arrest him, given that the transcripts from his hearing
12  likely could not have been prepared that quickly, but he complied with ICE's instruction and
13  reported in person. Doc. 1 at ¶ 42; Doc. 1-3, Ramazan M. Decl. at ¶ 16.

14      When he reported to the ICE office, agents arrested him. Doc. 1 at ¶ 43; Doc. 1-3,
15  Ramazan M. Decl. at ¶ 17. Petitioner indicates that the agents told him that he was being arrested
16  because he had lost his asylum case and that he would have to pursue any further relief, such as
17  an appeal, from detention. Doc. 1 at ¶ 43; Doc. 1-3, Ramazan M. Decl. at ¶ 17. The agents then
18  transported petitioner to Golden State Annex, where he remains detained. Doc. 1 at ¶ 43.

19      Petitioner appealed the denial of his asylum application, and the Board of Immigration
20  Appeals denied relief on October 6, 2025. *Id.* ¶ 44. He then appealed to the Ninth Circuit, which
21  has temporarily stayed his removal order pursuant to Ninth Circuit General Order 6.4(c). *Id.* ¶ 45.
22  His appeal remains pending. *Id.*

23      Since being detained, petitioner has been unable to support his wife, who is now in her
24  third trimester of pregnancy and has multiple health conditions and is unable to work. Doc. 1 at
25  ¶ 49. Petitioner fears he will miss the birth of his first child. Doc. 1-3, Ramazan M. Decl. at

---

[4] Petitioner represents that he faced torture and death threats in Russia based on his Muslim faith and opposition to the war in Ukraine. Doc. 1 at ¶ 37; Doc. 1-3, Ramazan M. Decl. at ¶ 2. Petitioner indicates that he was detained, interrogated, and tortured by Russian state officials due to these beliefs. Doc. 1-3, Ramazan M. Decl. at ¶ 2.

¶¶ 27–28. Petitioner also asserts that he has developed several health conditions while in detention and has not received adequate care, and he alleges that officers at Golden State Annex treat Muslim detainees differently than others, preventing them from praying together. Doc. 1-3, Ramazan M. Decl. at ¶¶ 20–26. The government notes that petitioner was involved in a fight with several other detainees on September 15, 2025. Doc. 7-1, Jaimes Decl. at ¶ 13.

## II.     Conversion of the Motion

When the Court set a briefing schedule on the motion, it directed the parties to state their position on whether the motion for temporary restraining order should be converted to a motion for preliminary injunction. Doc. 6. The parties agreed that the motion should be converted. *See* Doc. 7 at 3 n.1; Doc. 8 at 4. Given that the standard for issuing a temporary restraining order and preliminary injunction is the same, *see Stuhlbarg Int'l Sales Co. v. John D. Bush & Co.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001), and respondents had notice and opportunity to respond in opposition, petitioner's motion is converted to a motion for preliminary injunction.

## III.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20 (citing *Munaf*, 553 U.S. at 689–90; *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)). "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025) (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)). "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

**IV.     Discussion**

Petitioner argues that his re-detention violates the Due Process Clause of the Fifth Amendment and ICE's own regulations governing the revocation of humanitarian parole. *See* Doc. 3.[5]  The Court analyzes petitioner's likelihood of success before turning to the other *Winter* factors.

### a.  Likelihood of Success on the Merits

#### 1.  Due Process

Because civil immigration detention is typically justified only when a noncitizen presents a risk of flight or danger to the community, see *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), *Padilla v. ICE*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023), petitioner argues that the Due Process Clause bars the government from re-detaining him without first providing a hearing where it must prove he is a flight risk or danger.  Doc. 2 at 12–20.  Respondents make two threshold arguments in response.

First, they argue that petitioner has no due process rights and that his rights are limited to those provided by statute.  Doc. 7 at 10 (citing *DHS v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020), and *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)).  This argument is unpersuasive for two reasons.  First, it fails to appreciate the distinction between persons already located inside the United States, like petitioner, and persons attempting to enter the United States, like the petitioners in *Thuraissigiam* and *Landon*.  "It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas*, 533 U.S. at 693 (citing *United States v. Verdugo–Urquidez,* 494 U.S. 259, 269 (1990); *Johnson v. Eisentrager,* 339 U.S. 763, 784 (1950)).  "But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful,

---

[5] Petitioner claims that ICE failed to follow its own regulations in revoking his parole, including by not providing notice to him of its intent to do so.  As petitioner seeks release from custody and an order requiring a pre-deprivation bond hearing before he is re-detained, and full relief turns on the likelihood of his success on his due process claim, the Court addresses petitioner's due process argument below.  The Court declines to address, at this time, petitioner's additional claim regarding ICE's alleged failure to follow its regulations governing revocation of parole.

Case 1:25-cv-01356-KES-SKO     Document 9     Filed 11/10/25     Page 7 of 16

1  unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *see Hernandez v. Sessions*, 872

2  F.3d 976, 990 (9th Cir. 2017) ("[I]t is well-established that the Due Process Clause stands as a

3  significant constraint on the manner in which the political branches may exercise their plenary

4  authority.").

5  Second, respondents' argument misconstrues the nature of the challenge that petitioner

6  brings in this case, which is a challenge to his detention. *Thuraissigiam* held that a petitioner who

7  was stopped at the border did not have any due process rights *regarding admission into* the

8  United States. *Thuraissigiam*, 591 U.S. at 107; *see also Landon*, 459 U.S. at 32 ("("[A]n alien

9  seeking initial admission to the United States requests a privilege and has no constitutional rights

10 regarding his application . . . ."). However, petitioner challenges his re-detention without a

11 hearing; he does not challenge in this habeas action any determination regarding his admissibility.

12 *See Padilla v. ICE*, 704 F. Supp. 3d 1163, 1170–72 (W.D. Wash. 2023) (discussing

13 *Thuraissigiam* and explaining the distinction between a challenge to admission and a challenge to

14 detention); *Hernandez*, 872 F.3d at 981 ("[T]he government's discretion to [detain] non-citizens

15 is always constrained by the requirements of due process.").

16 "Although the Supreme Court has described Congress's power over the 'policies and rules

17 for exclusion of aliens' as 'plenary,' and held that this court must generally 'defer to Executive

18 and Legislative Branch decisionmaking in that area,' it is well-established that the Due Process

19 Clause stands as a significant constraint on the manner in which the political branches may

20 exercise their plenary authority"—through detention or otherwise. *Hernandez*, 872 F.3d at 990

21 n.17 (citing *Kleindienst*, 408 U.S. at 769; *Zadvydas*, 533 U.S. at 695). The Due Process Clause

22 protects petitioner, a person inside the United States, from unlawful detention. *See Zadvydas*, 533

23 U.S. at 693.

24 Next, respondents asserts that petitioner is mandatorily detained pursuant to 8 U.S.C.

25 § 1225(b)(2)(A), and argues that, in other contexts, the Supreme Court has upheld mandatory

26 detention schemes. Doc. 7 at 8–10 (citing *Demore v. Kim*, 538 U.S. 510 (2003)). In *Demore*, the

27 Supreme Court upheld the constitutionality of § 1226(c), a mandatory detention provision, on a

28 facial challenge. *Demore*, 538 U.S. at 513. A facial challenge requires a plaintiff to show that a

7

1    statute is "unconstitutional in every conceivable application."  *Foti v. City of Menlo Park*, 146
2    F.3d 629, 635 (9th Cir. 1998).  In contrast, an as-applied challenge requires a plaintiff to show
3    only that "the application of the statute to a specific factual circumstance" is unconstitutional.
4    *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011).  As other courts have explained in
5    considering *Demore*, its conclusion that § 1226(c)'s mandatory detention scheme is constitutional
6    in some of its applications "does not mean that the Court does not have the power to grant
7    petitions for habeas corpus raising *as-applied* constitutional challenges to [] detention without a
8    bond hearing."  *Perera v. Jennings*, 598 F. Supp. 3d 736, 744 (N.D. Cal. 2022).  Here, petitioner
9    presses an as-applied constitutional challenge: he argues that the Due Process Clause bars the
10   government from re-detaining him without first providing a bond hearing.  Doc. 3 at 12–20.

11   Petitioner's as-applied constitutional challenge is analyzed "in two steps: the first asks
12   whether there exists a protected liberty interest under the Due Process Clause, and the second
13   examines the procedures necessary to ensure any deprivation of that protected liberty interest
14   accords with the Constitution."  *Garcia v. Andrews*, No. 2:25-cv-01884-TLN-SCR, 2025 WL
15   1927596, at *2 (E.D. Cal. July 14, 2025) (citing *Kentucky Dep't of Corrections v. Thompson*, 490
16   U.S. 454, 460 (1989)).

17                              **1.  Liberty Interest**

18   A protected liberty interest may arise from a conditional release from physical restraint.
19   *Young v. Harper*, 520 U.S. 143, 147–49 (1997).  Even when a statute allows the government to
20   arrest and detain an individual, a protected liberty interest under the Due Process Clause may
21   entitle the individual to procedural protections not found in the statute.  *See id.* (due process
22   requires pre-deprivation hearing before revocation of preparole); *Gagnon v. Scarpelli*, 411 U.S.
23   778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)
24   (same, in parole context).  To determine whether a specific conditional release rises to the level of
25   a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific
26   conditional release in the case before them with the liberty interest in parole as characterized by
27   *Morrissey*."  *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation
28   marks and citation omitted).


1    In *Morrissey*, the Supreme Court explained that parole from a criminal conviction
2 "enables [the parolee] to do a wide range of things open to persons" who have never been in
3 custody or convicted of any crime, including to live at home, work, and "be with family and
4 friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482.
5 "Though the [government] properly subjects [the parolee] to many restrictions not applicable to
6 other citizens," such as monitoring and seeking authorization to work and travel, his "condition is
7 very different from that of confinement in a prison." *Id.* "The parolee has relied on at least an
8 implicit promise that parole will be revoked only if he fails to live up to the parole conditions."
9 *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on the parolee." *Id.* (quotations
10 omitted). Therefore, a parolee possesses a protected interest in his "continued liberty." *Id.* at
11 481–84.

12   Petitioner's parole from detention is similar. For two-and-a-half years, it allowed him to
13 establish ties in the community while pursuing relief in his removal proceedings. He received
14 employment authorization and was gainfully employed, he volunteered at his mosque and a
15 foodbank, and he and his wife took their first steps to starting a family. Petitioner is also not yet
16 subject to an executable removal order. Under 8 U.S.C. § 1231(a)(1), a noncitizen must be
17 removed during the "removal period." 8 U.S.C. § 1231(a)(1)(A). "If the removal order is
18 judicially reviewed and if a court orders a stay of the removal of the alien," then the removal
19 period begins on "the date of the court's final order." 8 U.S.C. § 1231(a)(1)(B)(ii). Petitioner's
20 removal is stayed by the Ninth Circuit pending his appeal, so he is not yet in the removal period.

21   The Court finds that petitioner has a protected liberty interest in his release. *See*
22 *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *4 (N.D. Cal. July 17,
23 2025) (recognizing that "the liberty interest that arises upon release [from immigration detention]
24 is *inherent* in the Due Process Clause"); *Ortega v. Kaiser*, No. 25-cv-05259-JST, 2025 WL
25 1771438, at *3 (N.D. Cal. June 26, 2025) (collecting cases finding that noncitizens who have
26 been released have a strong liberty interest). The Court must therefore determine what process is
27 due before the government may terminate his liberty.

28

### 2. *Mathews* Factors

Due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). The procedural protections required in a given situation are evaluated using the *Mathews v. Eldridge* factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017) (applying *Mathews* factors in immigration detention context).[6]

Turning to the first factor, petitioner has a significant private interest in remaining free from detention. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Petitioner had been out of custody for nearly two-and-a-half years, and during that time, began a life in the United States, living with his wife, working, and volunteering. His detention denies him that freedom.

Second, "the risk of an erroneous deprivation [of liberty] is high" where, as here, "[the petitioner] has not received any bond or custody redetermination hearing." *A.E. v. Andrews*, No. 1:25-cv-00107-KES-SKO, 2025 WL 1424382, at *5 (E.D. Cal. May 16, 2025). Civil immigration detention, which is "nonpunitive in purpose and effect[,]" is justified when a noncitizen presents a risk of flight or danger to the community. *See Zadvydas*, 533 U.S. at 690;

---

[6] Respondents note that the Supreme Court has never utilized the *Mathews* factors in evaluating a Due Process claim by a noncitizen, Doc. 11 at 7 (citing *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022)), but respondents analyze the *Mathews* factors without proposing an alternative test. Courts in this circuit regularly employ the *Mathews* factors to evaluate the Due Process argument that petitioner makes here. *See e.g.*, *Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *4–6 (N.D. Cal. Aug. 21, 2025); *Pinchi v. Noem,* No. 25-CV-05632-RMI (RFL), 2025 WL 1853763, at *1 (N.D. Cal. July 4, 2025). The Court does not see a reason to depart from this practice. As the Ninth Circuit has noted, "*Mathews* remains a flexible test" that accounts for the competing interests of an individual detainee and the government. *Rodriguez Diaz*, 53 F.4th at 1206–07.

1  *Padilla*, 704 F. Supp. 3d at 1172.  While respondents argue that petitioner is a flight risk, the
2  purpose of a bond hearing is for a neutral decisionmaker to consider and evaluate such an
3  argument to determine whether it is consistent with the facts and to ensure that noncitizens like
4  petitioner are not deprived of their liberty without justification.  In a similar case, where a
5  noncitizen had missed two appointments with ICE agents, the District Court for the Western
6  District of Washington found: It does not "necessarily follow that Petitioner can be detained for
7  those violations without a hearing.  That the Government may believe it has a valid reason to
8  detain petitioner does not eliminate its obligation to effectuate the detention in a manner that
9  comports with due process."  *E.A. T.B. v. Wamsley*, No. C25-1192-KKE, 2025 WL 2402130, at
10  *4 (W.D. Wash. Aug. 19, 2025).  Similarly, here, as there were no procedural safeguards to
11  determine if petitioner's re-detention was justified, "the probable value of additional procedural
12  safeguards, i.e., a bond hearing, is high."  *A.E.*, 2025 WL 1424382, at *5.

13  Third, although the government has a strong interest in enforcing the immigration laws,
14  the government's interest in detaining petitioner without a hearing is "low."  *Ortega v. Bonnar*,
15  415 F. Supp. 3d 963, 970 (N.D. Cal. 2019); *Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025
16  WL 691664, at *6 (E.D. Cal. March 3, 2025); *see also Morrissey*, 408 U.S. at 483 (noting that
17  "the State has an *overwhelming interest* in being able to return the individual to imprisonment
18  without the burden of a new adversary criminal trial[,] . . . [y]et, the State has *no interest* in
19  revoking parole without some informal procedural guarantees.").  In immigration court, custody
20  hearings are routine and impose a "minimal" cost.  *Doe*, 2025 WL 691664, at *6.  "If the
21  government wishes to re-arrest [petitioner] at any point, it has the power to take steps toward
22  doing so; but its interest in doing so without a hearing is low."  *Ortega*, 415 F. Supp. 3d at 970.

23  On balance, the *Mathews* factors show that petitioner is entitled to a bond hearing.

24  **3.  Pre-Deprivation v. Post-Deprivation Bond Hearing**

25  The Court must determine whether a pre-deprivation or post-deprivation hearing is
26  warranted on the facts of this case.  The district court's analysis in *Rodriguez Diaz v. Kaiser*, No.
27  25-CV-05071-TLT, 2025 WL 3011852 (N.D. Cal. Sept. 16, 2025), is instructive.  There, the
28  petitioner had allegedly incurred six violations of his release conditions, including missed check-

11

ins and home visits. *Id.* at *3–4. Following the petitioner's last missed home visit, he appeared for a scheduled check-in. *Id.* The court found that the petitioner was entitled to a pre-deprivation hearing because each time that the petitioner "reported to ICE for a check-in" following one of his six alleged violations, "an ICE officer, at least implicitly, made a finding that [the petitioner] was not a flight risk." *Id.* at *13 (internal quotations omitted); *see E.A.T.B.*, 2025 WL 1402130, at *5 ("That Petitioner's alleged violations occurred months before they were acted upon, and Petitioner attended multiple immigration court hearings where any violations could have been addressed but were not, undermines any suggestion that the Government's interests must be satisfied immediately or that the cost of procedural safeguards would be insurmountable."). Similarly, here, petitioner has appeared for in-person check-ins after each of his asserted violations. The fact that ICE did not act upon those violations for over a year undercuts any argument that he should be afforded less due process. *See E.A.T.B.*, 2025 WL 1402130, at *5.

Respondents further argue that petitioner is more of a flight risk now because his asylum application has been denied, but this argument disregards that petitioner showed up for an in-person check-in several days *after* his asylum application was denied. While noncitizens may have a greater incentive to flee as the prospect of removal looms closer, petitioner's record while on release does not reflect that he would fail to appear for a bond hearing. Petitioner seeks a bond hearing to argue that he should remain out of custody while he pursues his appeal to the Ninth Circuit on his asylum decision; there is no indication that he would fail to appear for the bond hearing and would instead forfeit his appeal by fleeing.

The Court finds that a pre-deprivation hearing is appropriate. *See also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) ("'[T]he root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest.'" (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)). As other courts have concluded in similar circumstances, "a post-deprivation hearing cannot serve as an adequate procedural safeguard because it is after the fact and cannot prevent an erroneous deprivation of liberty." *E.A.T.B.*, 2025 WL 2402130, at *6.

With these considerations in mind, petitioner is likely to succeed on the merits of his

12

claim that his re-detention without a hearing violates the Due Process Clause.

### b. Petitioner Will Face Irreparable Harm Without Injunctive Relief.

Turning to the second *Winters* factor, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Hernandez*, 872 F.3d at 994 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting Wright, Miller, & Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)). Given the Court's conclusion that petitioner is likely to succeed on the merits of his claim that his re-detention without a bond hearing violates the Due Process Clause, petitioner faces irreparable harm absent injunctive relief.

### c. Balance of Equities and Public Interest

When the government is the nonmoving party, "the last two *Winter* factors merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (internal citations omitted). Faced with a choice "between [minimally costly procedures] and preventable human suffering," as discussed above, the Court concludes "that the balance of hardships tips decidedly in [petitioner's] favor." *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

The public interest also weighs in petitioner's favor. "The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz*, 2025 WL 1676854, at *3 (citing *Jorge M.F. v. Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *3) (N.D. Cal. Mar. 1, 2021); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (citing *Padilla*, 953 F.3d at 1147–48).

### d. Burden of Proof

The parties dispute whether the burden of proof should fall on petitioner or the government at the bond hearing. The Court finds that in this context the burden is more appropriately placed on the government. *See Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1107

(W.D. Wash. 2019); *Abdul-Samed v. Warden of Golden State Annex Det. Facility*, No. 1:25-CV-00098-SAB-HC, 2025 WL 2099343, at *8 (E.D. Cal. July 25, 2025).

In *Singh v. Holder*, the Ninth Circuit held, in the context of hearings provided for those detained under § 1226(c), that "the substantial liberty interest at stake" warranted placing the burden on the government to "prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond." *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011), *abrogated on other grounds by Jennings v. Rodriguez*, 583 U.S. 281 (2018); *see also Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1199 (9th Cir. 2022) (explaining that *Singh* was based on general principles of due process). "Because it is improper to ask the individual to 'share equally with society the risk of error when the possible injury to the individual'—deprivation of liberty—is so significant, a clear and convincing evidence standard of proof provides the appropriate level of procedural protection." *Id.* at 1203–04 (quoting *Addington v. Texas,* 441 U.S. 418, 427 (1979)). These same concerns are present here.

The Ninth Circuit later extended these principles to bond hearings for those detained under § 1225(b) and § 1231(a). *See Diouf v. Napolitano*, 634 F.3d 1081, 1082 (9th Cir. 2011); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th Cir. 2013) ("*Rodriguez*"). Although the Supreme Court subsequently held in *Jennings* that the constitutional avoidance canon could not be used to read a bond hearing requirement into the statute, it did not address an as-applied constitutional due process challenge. *Jennings*, 583 U.S. at 304–06, 312 ("Because the Court of Appeals . . . had no occasion to consider respondents' constitutional arguments on their merits[,] . . . we do not reach those arguments."). *Singh* "relied on the Due Process Clause in determining" who should bear the burden of proof at those bond hearings. *Rodriguez Diaz*, 53 F.4th at 1202; *see Singh*, 638 F.3d at 1203–06. The issue of the burden of proof at a hearing required by due process therefore appears to remain governed by *Rodriguez* and its extension of *Singh*'s requirements to bond hearings for § 1225(b) detainees. *See Maliwat v. Scott*, No. 2:25-CV-00788-TMC, 2025 WL 2256711, at *10 (W.D. Wash. Aug. 7, 2025) (applying *Singh* in § 1225(b) case); *Banda*, 385 F. Supp. 3d at 1107 (same); *Abdul-Samed*, No. 1:25-CV-00098-SAB-HC, 2025 WL 2099343, at *8 (same).

14

1    The government points to *Rodriguez Diaz*, which held that § 1226(a), which places the burden of proof on the detainee at a bond hearing, was constitutionally adequate. *Rodriguez Diaz*, 53 F.4th at 1210. But "[s]ection 1226(a) offers substantial procedural protections to detained persons," *id.* at 1194, which cannot be said of § 1225(b). In that regard, § 1225(b) is more like § 1226(c), as both mandate detention. Accordingly, the burden of proof standard highlighted in *Singh* governs this case.[7]

### e. Remedy

In conclusion, the Court finds that the requirements for issuing a preliminary injunction are met. Petitioner's immediate release is required to return him to the status quo ante—"the last uncontested status which preceded the pending controversy." *Pinchi*, 2025 WL 1853763, at *3; *Kuzmenko v. Phillips*, No. 2:25-cv-00663-DJC-AC, 2025 WL 779743, at *2 (E.D. Cal. Mar. 10, 2025); *see also Y-Z-L-H*, 2025 WL 1898025, at *14 (ordering immediate release due to violation of 8 C.F.R. § 212.5(e)(2)(i)); *Valdez v. Joyce*, 25 Civ. 4627, 2025 WL 1707737, at *5 (S.D.N.Y. June 18, 2025) (ordering immediate release of unlawfully detained noncitizen); *Ercelik v. Hyde*, No. 1:25-CV-11007-AK, 2025 WL 1361543, at *15–16 (D. Mass. May 8, 2025) (same); *Günaydın v. Trump*, No. 25-CV-01151, 2025 WL 1459154, at *10–11 (D. Minn. May 21, 2025) (same). Respondents are ordered to release petitioner immediately. Respondents may not re-detain petitioner unless the government proves by clear and convincing evidence at a bond hearing before a neutral decisionmaker that petitioner is a flight risk or danger to the community.

## V.  Conclusion and Order

Accordingly, petitioner's motion for a preliminary injunction, Doc. 3, is GRANTED. Respondents are ORDERED to release petitioner immediately. Respondents are also ENJOINED

---

[7] The government also argues that *Zadvydas* placed the burden on the petitioner to "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future" before making "the government respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701. But the cited portion of *Zadvydas* outlined the appropriate procedure to be used at a preliminary showing on a challenge to prolonged detention, not whether the burden of proof should fall on the detainee or the government at a bond hearing to determine whether the detainee should be re-detained, as a flight risk or danger to the community based on changed conditions, after an extended period of release. *See id.*

AND RESTRAINED from re-detaining petitioner unless they demonstrate, by clear and convincing evidence at a pre-deprivation bond hearing before a neutral decisionmaker, that petitioner is a flight risk or danger to the community such that his physical custody is legally justified.

The portion of the Court's October 16, 2025 minute order, Doc. 5, regarding the removal or transfer of petitioner is vacated as moot.

The bond requirement of Federal Rule of Civil Procedure 65(c) is waived. Courts regularly waive security in cases like this one. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011); *Garcia*, 2025 WL 1676855, at *3; *Pinchi*, 2025 WL 1853763, at *4.

Respondents may file an additional brief related to the merits of the petition within 30 days, and petitioner may file a reply brief within 15 days of respondents' brief. Alternatively, the parties may stipulate to a different briefing schedule or to submitting the petition on the merits based on the current record.

IT IS SO ORDERED.

Dated:   November 10, 2025

UNITED STATES DISTRICT JUDGE